IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CT-03325-M

| | | |
|---|---|---|
| JERMELL CRAWFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JOHNNY HAWKINS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' pending motion for summary judgment. Mot. [D.E. 75]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On October 19, 2020, Jermell Crawford ("plaintiff"), a state inmate proceeding *pro se*, filed a proposed order and a motion seeking injunctive relief. See Mot. [D.E. 1]. Plaintiff subsequently filed an unverified complaint under 42 U.S.C. § 1983, Compl. [D.E. 4], and a motion to proceed without prepayment of fees, Mot. [D.E. 5], which the court granted, Order [D.E. 14].

Plaintiff names as defendants Superintendent Johnny Hawkins ("Hawkins"); Assistant Superintendent Billy Cooper ("Cooper"), Classification/Transfer Coordinator Antionette Faulcon ("Faulcon"), and Head Transfer Coordinator Jodie Penny ("Penny"), and generally alleges violations of his First, Eighth, and Fourteenth Amendment rights at Granville C.I. (formerly known as Polk C.I.) starting in September 2019 pursuant to his lack of a transfer after a change in his control status. Compl. [D.E. 4] at 5–6. Plaintiff specifically alleges he "was promoted off [High Security Maximum Control ("HCON")] Super-Max [in] September 2019" but was not transferred

"to a less strict facility." Id. at 5. Plaintiff asserts that, despite having no infractions, he was held in "Super-Max" until February 28, 2020, when he was promoted to "modified housing . . . which is basically regular population." Id. Plaintiff further alleges he spoke to Hawkins several times, and to defendants Cooper and Faulcon, filed grievances, and was given "the COVID-19 story [sic]."[1] Id. Plaintiff also alleges he told Hawkins, Cooper, and Faulcon, of his intent to file a lawsuit, "and they said they will make sure I rot in this cell [,] and they do what they want to me [because] I'm [an] inmate." Id. Plaintiff asserts he wrote Penny several times about transfer, but she never responded. Id. Plaintiff alleges, by keeping him in "solitary," defendants are violating the Eighth Amendment and his due process rights because he was "promoted off HCON and they keep putting [plaintiff] on A-Seg to justify what they are doing to me holding me on 24-hour confinement." Id. at 6. Plaintiff asserts he was held in "solitary" for months "for retaliation of saying I was gone [sic] file a lawsuit." Id. at 7. Plaintiff reiterates, despite his "regular population" status, he was held in "Super Max" on 24-hour lockdown. Id. As to his injury, plaintiff alleges: "From me being in the hole so long I'm seeing things that's not there. I'm emotionally distressed and my rights being violated and that's irreparable injury [sic]." Id. at 8. For relief, plaintiff seeks a transfer, "funds for [his] emotional distress," and restoration of "gain time" lost when wrongly held in "Super-Max" where "gain time" is unavailable. Id. at 9.

Plaintiff's amended complaint states: he is a mental health level 3 inmate suffering from depression, paranoia, and ADHD; Super-Max isolation is making his mental health conditions

---

[1] The court takes judicial notice of the fact that coronavirus disease, or COVID-19, is caused by severe acute respiratory syndrome coronavirus 2, or SARS-CoV-2, and, according to Centers for Disease Control ("CDC") data, has totaled over one hundred million reported cases, and over one million deaths, within the United States circa the date of this opinion. See generally COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/ (visited May 8, 2023); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

2

worse; he sometimes hears voices and sees "things that's not there [sic]"; he's "tried to commit suicide a couple [of] times" and has been on a suicide watch list; he told Hawkins and Cooper his mental health had gotten worse and "they both laughed at" him and told him that population management, run by Penny, is the reason he had not been transferred; and "they ignored the fact of my mental health and that is (deliberate indifference) and I can prove it and my psychologist Dr. Wilson said he would be willing to speak on my behalf [sic]."  Mot. Attach. [D.E. 16-1] at 1.

On July 26, 2021, the court, *inter alia*, granted the motion to amend, conducted its initial review, dismissed plaintiff's claims alleging entitlement to a transfer or change of custody classification, as well as his claims against Penny, but allowed to proceed plaintiff's Fourteenth Amendment due process claim against Hawkins, Cooper, and Faulcon (collectively, "defendants"), his First Amendment retaliation claim against defendants, and his Eighth Amendment deliberate indifference claim against Hawkins and Cooper.  Order [D.E. 37].

On November 22, 2021, defendants answered the complaint.  Answer [D.E. 47].

On November 30, 2021, the court's scheduling order, *inter alia*, appointed North Carolina Prisoner Legal Services, Inc. ("NCPLS"), to assist with discovery.  Order [D.E. 48].  NCPLS counsel later informed the court that discovery was complete, and NCPLS had given plaintiff legal advice, but that NCPLS would not provide further representation in this action.  See [D.E. 55].

On November 4, 2022, defendants filed a motion for summary judgment, Mot. [D.E. 75], a memorandum in support [D.E. 76], a statement of facts [D.E. 77], and an appendix [D.E. 78].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam) ("Roseboro"), the court notified plaintiff about the motion for summary judgment, the consequences of failing to respond, and the response deadline.  [D.E. 79].

3

Plaintiff filed a response in opposition [D.E. 82], a response contesting defendants' statement of material facts [D.E. 83], a memorandum [D.E. 84], interrogatories [D.E. 85], an appendix [D.E. 86], an opposing statement of facts [D.E. 87], and another memorandum [D.E. 88].

Factual Disputes:

The parties generally agree that plaintiff was a North Carolina Department of Public Safety ("NCDPS") inmate at Granville C.I. from April 16, 2019, to January 13, 2021. The parties, however, dispute whether plaintiff was improperly kept in "Super Max" indefinitely,[2] as to the reasons plaintiff's prison transfer was delayed,[3] whether defendants were personally responsible for plaintiff's custody classification change or facility transfer,[4] whether an "audit" was performed

---

[2] Defendants state: plaintiff's "custody classification records demonstrate that he was not continually kept in 'Super Max' indefinitely as he alleges"; and plaintiff's "control status was reviewed per NCDPS policy and was changed, when appropriate." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶¶6–8. Plaintiff states: "Yes I was continually kept in (Supermax). I was in regular population status by the time I was released off HCON and I filed numerous grievances that defendants personally signed off on and numerous conversations with the defendants and the defendants admitted I was continually held [sic]"; and "my control status was (regular population) and I was in a supermax 24 hour lockdown setting and that was not at all appropriate [sic]." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶¶6–7 (citing Interrog. [D.E. 85] at 6 (identifying the number of days plaintiff was held in solitary confinement as 345)).

[3] Defendants state: plaintiff "was identified by NCDPS personnel for transfer out of Granville C.I. when his control status permitted"; plaintiff "was put on a transfer waiting list, as he could not be transferred out of Granville C.I. until a space was available at another facility"; "[t]ransfers during this time period were also limited in an effort to reduce the spread of COVID-19 among offenders and between facilities"; and plaintiff "was transferred from Granville C.I. as soon as a space became available at another facility and in accordance with NCDPS COVID-19 mitigation protocol." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶¶8–11. Plaintiff states: "I was transferred from Granville C.I. on the accord of [sic] they got word I filed a lawsuit and then they wanted to all of sudden transfer me then"; and "[t]hey say I was on the transfer list but that's not true. It [doesn't] take 16 months to get transferred"; a newspaper article of record notes transfers slowed but did not stop; "high rank officials was [sic] still transferring inmates"; other HCON inmates were transferred, but he was not transferred in retaliation for threatening a lawsuit; he was transferred after he filed the lawsuit; and Hawkins admitted awareness of the suit. See Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶¶8–11.

[4] Defendants state: "None of the named Defendants had control over inmate Crawford's classification or his transfer between facilities"; "Per NCDPS policy, the Director's Classification Committee ["DCC"] in Raleigh oversees the classification of offenders and Raleigh approves offender transfer between facilities"; and "Transfer between facilities is not controlled by any individual at any given facility." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶¶13–15. Plaintiff states: defendants "had all the control over my classification status"; "the prison you are housed at has all the control over DCC and transfers" because the Warden and DCC coordinator have to "contact Raleigh" for an inmate to "get transferred and classified"; and "the warden can surely pick up the phone and get any inmate transferred ASAP[,] the warden or Assistant warden has the power to arrange that for a fact." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶¶13–15.

4

as to plaintiff's custody status,[5] whether defendants retaliated against plaintiff for threating to file a lawsuit,[6] whether Hawkins and Cooper ignored plaintiff's medical concerns,[7] and whether plaintiff was wrongly denied "Earn/Gain Merit Time" at Granville C.I.[8]

Parties' Arguments:

Defendants argue: plaintiff failed to exhaust administrative remedies as to deliberate indifference and retaliation claims; "he was earning 'gain time' and had privileges associated with his correct classification" in this timeframe; he lacks a constitutional right to a transfer, but he was transferred as soon as COVID-19 protocols allowed and space was available; "none of the named Defendants had a definitive role in determining the Plaintiff's classification"; his extended presence at Granville C.I. did not violate due process; he received the same due process all NCDPS

---

[5] Defendants state: "An audit of Plaintiff's control status was performed by the NCDPS Director of Classification who determined that Plaintiff's control status assignments have been correct." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶16. Plaintiff states: "That's not true. I never was given no audit [sic]. I didn't even have no infractions at that time or no hearing for my continued placement in 24-hour lockdown setting [sic]." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶16.

[6] Defendants state: they "deny having a conversation" where plaintiff "informed them of his intent to file a lawsuit"; they "deny telling the Plaintiff that they would make sure he rotted in his cell or that I 'do what I want' because he is an 'inmate'"; they "personally strive to ensure every inmate they work with is treated with fairness, dignity, and respect"; and they "have treated the Plaintiff with fairness, dignity, and respect in every interaction in which they have had with him [sic]." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶¶17–20. Plaintiff states: Hawkins admitted knowing of the lawsuit; he finds it "hard to believe" that Cooper and Faulcon "deny knowing" about it; Hawkins admitted talking to him, and Cooper and Faulcon were present when he "told them [his] mental health is getting worser [sic] and [he] was [going to] file a lawsuit and they laughed"; "defendants did this to me with evil intent and motive"; "defendants treated me terrible [sic] and violated my rights look at the proof [sic]." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶¶17–20.

[7] Defendants state: neither Hawkins nor Cooper "had discussions with [plaintiff] where [plaintiff] expressed any medical concerns about his incarceration" or "intentionally ignored any medical concerns expressed by [plaintiff]." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶¶21–22. Plaintiff states: "I spoke with Hawkins and Cooper about my mental health several times"; Cooper signed off on grievance #12892 and grievance #14365 in which plaintiff discussed his mental health condition; and Hawkins admitted talking to plaintiff about his mental health; "and they [Hawkins and Cooper] both laughed." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶¶21–22.

[8] Defendants state: "A review of [plaintiff's] 'Earn/Gain Merit Time' demonstrates that during his incarceration in Granville CI from April 16, 2019 [,] through January 13, 2021, he was credited Earn/Gain time on numerous occasions." Defs.' Stmt. Mat. Facts [D.E. 77] at ¶24. Plaintiff states: "That is impossible. You can not get any gain time or merit time on a control status except P-Con when you're on [Restrictive Housing for Control Purposes ("RHCP")] or HCON you do not receive any gain time"; and "If I was transferred properly to regular population [,] you receive 3 to 9 days every month for being in population [sic]." Pl.'s Stmt. Mat. Facts [D.E. 87] at ¶24.

5

inmates receive; he cannot present credible evidence of his retaliation claim; he fails to allege a viable Eighth Amendment claim; official capacity claims fail under the Eleventh Amendment; and defendants are entitled to qualified immunity.  See Defs.' Mem. [D.E. 76] at 6–17.

In opposition, plaintiff argues: the record reflects he filed multiple documents showing defendants were aware of his complaint; defendants, with "evil intent [sic]," kept him "on super-max control status" for "17 months more after the date I was designated to be released from said control status"; prisoners have due process liberty interests; defendants' deliberate indifference to his excessive confinement constitutes cruel and unusual punishment; "the excessive confinement destroyed my morale.  I was hearing voices seeing things that's not there and defendants still refused to let me off super-max isolation."  See Pl.'s Mem. [D.E. 84]; Pl.'s Mem. [D.E. 88] at 1.

Plaintiff also argues defendants are not entitled to qualified immunity because they were:

"made aware numerous times of the atypical hardship that was placed on [plaintiff] due to the defendants act of deliberate indifference, excessive confinement which is cruel and unusual punishment in its worse way [sic] due to the emotional and mental damage [plaintiff has] suffered which far outweighs most physical injuries, all of which proves defendants have a liability issue at hand [sic]."

Pl.'s Mem. [D.E. 88] at 1–2.

Plaintiff further argues that defendants were "made aware of the hardship that excessive confinement does on a man's mental health," and that "all inmates face some degree of psychological trauma in reaction to extreme isolation in SHU setting [sic]."  Id. at 2.

In his appendix, plaintiff asserts "there is a real dispute in this case" and seeks to rely upon documents previously submitted in support of his allegations.  Pl.'s App. [D.E. 86] at 1.  Plaintiff contends the interrogatories support his claims that defendants knew of his mental health issues. Id.  Plaintiff reiterates his claim that defendants were present when he stated he was going to file

6

a lawsuit and that Cooper and Hawkins laughed at him.   Id.   Plaintiff contends that Hawkins's admission that Hawkins spoke with plaintiff is a "causal link" to the "adverse action."   Id. at 1–2. Plaintiff further contends that Faulcon and Cooper had actual knowledge because they "signed off" on his grievances.   Id. at 2.   Plaintiff also reiterates his claim that transfers never stopped, he was not transferred due to "evil intent," and that defendants told him he will "rot in the cell."   Id.

<u>Legal Standard</u>:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).   The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case.   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).   Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, <u>Anderson</u>, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial."   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (emphasis and quotation omitted).   A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial.   <u>Anderson</u>, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party.   <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).

<u>Discussion</u>:

First, plaintiff's claims against defendants in their official capacities are barred by the Eleventh Amendment unless the state has waived immunity.   <u>See</u> <u>Will v. Michigan Dep't of State</u>

7

Police, 491 U.S. 58, 66, 71 (1989). Because North Carolina has not waived immunity, defendants are entitled to summary judgment on his official capacity claims. See Anderson, 477 U.S. at 249.

Turning to the defendants' exhaustion argument, the Prison Litigation Reform Act ("PLRA") states, in relevant part: "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); Jones v. Bock, 549 U.S. 199, 211 (2007) ("[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court.").

Courts provide a limited PLRA exhaustion exception where a plaintiff files a complaint with properly exhausted claims, and then moves to amend the complaint to add new claims which he exhausted after filing the original action. See Moore v. Bennette, 517 F.3d 717, 730 (4th Cir. 2008); see also Mattox v. Edelman, 851 F.3d 583, 595 (6th Cir. 2017) ("the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint to add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim"); Barnes v. Briley, 420 F.3d 673, 677–78 (7th Cir. 2005); Ortiz v. Solomon, No. 5:15-CT-3251-FL, 2018 WL 505076, at *3 (E.D.N.C. Jan. 22, 2018).

The record reflects that, before filing this suit, plaintiff's fully exhausted grievances raised claims about Fourteenth Amendment due process and Eighth Amendment deliberate indifference to his mental health. See Defs.' App., Ex. 1C, [D.E. 78-4] at 1 (stating plaintiff completed nine Step 3 grievance appeals from July 1, 2019, to Oct. 18, 2021); id. at 13 (fully exhausted grievance stating plaintiff is being held in a super-max facility after he was released to RHCP); id. at 36 (fully exhausted grievance stating plaintiff is being that his kept in a super-max facility after he "was released to RHCP" in violation of Fourteenth Amendment's Due Process Clause and the Eight

8

Amendment because "supermax isolation makes mental illness worser [sic] and I am mental health level 3 [sic]"). Plaintiff subsequently exhausted a retaliation claim. See id. at 32 (fully exhausted grievance alleging retaliation). Accordingly, the court will address the claims on the merits.

Plaintiff's surviving Fourteenth Amendment due process claim is circumscribed. As the court noted, plaintiff lacks a constitutional right to a prison transfer or to any specific custody classification. Order [D.E. 37] at 5 (citing, inter alia, Meachum v. Fano, 427 U.S. 215, 225 (1976); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994)). The court, however, allowed to proceed plaintiff's procedural due process claim as to the alleged denial of his "gain time." See id. at 6.

The Fourteenth Amendment provides, in relevant part, that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015).

In examining a procedural due process claim, a court "first asks whether there exists a liberty or property interest which has been interfered with by the State." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989). If so, the court then "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Id. If not, plaintiff fails to establish that he is entitled to any level of procedural protection. See Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty [or property] interest").

Prisoners are only entitled to procedural due process protections for disciplinary proceedings that impose a punishment that either alters the duration of a sentence or constitutes an

9

"atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."
Sandin v. Conner, 515 U.S. 472, 484, 487 (1995). Moreover, "if no state statute, regulation, or policy creates such a liberty interest, a prisoner *cannot* 'invoke the procedural protections of the Due Process Clause.'" Prieto, 780 F.3d at 248 (quoting Meachum, 427 U.S. at 224).

When a prisoner's cognizable liberty or property interests are at issue in disciplinary hearings, the prisoner is entitled to limited due process rights including 1) advance written notice of the charges, 2) a hearing, 3) the right to call witnesses and present evidence when it is not inconsistent with institutional safety and concerns, and 4) a written decision. See Wolff v. McDonnell, 418 U.S. 539, 563–64 (1974). Such disciplinary findings also must be made by an impartial adjudicator, see id. at 570–71, and be supported by "some evidence in the record," see Superintendent, Mass. Corr. Inst. Walpole v. Hill, 472 U.S. 445, 454–55 (1985).

Although plaintiff alleges that he was denied "gain time" without due process when he was kept in "Super Max" custody despite having a different custody status and no infractions, see Compl. [D.E. 4] at 5–6, 9, defendants declare otherwise.

Cooper declares, *inter alia*: "The classification process encompasses, among other things, the determination of custody levels and control statuses"; "Custody levels are minimum, medium, and close custody"; "Control status refers to how an offender will be housed, and the statuses range from Regular Population (least control) to High Security Maximum Control ('HCON')"; plaintiff was assigned to control status HCON at Tabor C.I. on April 4, 2019; no one at Granville C.I., including defendants, had input on this HCON assignment; plaintiff was transferred to Granville C.I. on April 16, 2019, and was placed in HCON "because that was his then-current control status as determined by Tabor C.I."; plaintiff "was promoted after 179 days to control status Restrictive

10

Housing for Control Purposes ('RHCP') on March 15, 2020"; plaintiff remained in the same cell after his promotion to RHCP, but "[t]his is not improper"; "Plaintiff's promotion was part of a step-down program with the hope that Plaintiff would eventually be promoted from control status to regular population"; "Ideally, such a promotion to control status Modified Housing would result in Plaintiff's re-assignment to different housing assignment within days. That did not happen in plaintiff's case because Plaintiff's promotion meant that he would have to be transferred from Granville C.I. to a different facility"; plaintiff was not earlier transferred because of a transfer backlog and because "transfers between facilities were limited at that time due to COVID-19 and efforts to mitigate the spread of the virus among offender populations"; plaintiff was transferred to Alexander C.I. on January 13, 2021; "We are not able to transfer an offender until we are instructed to do so by Population Management in Raleigh"; the "speed and timing of transfers depends entirely on available bed space at an appropriate facility"; and plaintiff was transferred to another facility where he could be housed pursuant to his then-current Control Status "as quickly as possible." Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶¶5–7, 12–24.

Paula King, the NCDPS Manager of Classification and Technical Support Division of Adult Corrections, declares, *inter alia*: "An Offender's control status is determined through a multi-step process whereby an offender's case manager recommends a modification to an offender's control status, it undergoes both a unit level review and facility level review and is then sent to the Director's Classification Committee" ("DCC"); plaintiff's "assignments throughout his incarceration with NCDPS have followed proper review protocol and procedures"; plaintiff was assigned to HCON before his April 16, 2019, transfer to Granville C.I.; plaintiff "only spent 1 cycle of 180 days in HCON," from April 4, 2019, to September 18, 2019, when he was promoted

11

to Restrictive Housing for Control Purposes ('RHCP'), a lesser form of control"; "[t]he speed and timing of transfers depend entirely on available bed space at an appropriate facility"; "[d]uring this timeframe, transfers of inmates within NCDPS was greatly curtailed due to COVID-19. Inmates were transferred in pods and when beds became available as mitigation measures to prevent the spread of COVID-19 within the communal living spaces of correctional facilities"; [t]hese steps were taking to attempt to mitigate the spread of COVID-19 among the Division of Corrections in response to a declared global pandemic"; plaintiff "was 'backlogged' for transfer to another facility, meaning placed on a transfer list, when he became eligible for transfer"; plaintiff was transferred to a facility "where he could be housed commensurate with his then-current Control/custody Status, as quickly as possible"; "a review of [plaintiff's] 'Earn/Gain Merit Time' demonstrates that during his incarceration in Granville C.I. from April 16, 2019 through January 13, 2021, he was credited Earn/Gain time on numerous occasions." Defs.' App., Ex. 3, King Decl. [D.E. 78-11] at ¶¶2, 7–8, 10–16, 19.

Hawkins declares, *inter alia*: Hawkins had no input on plaintiff's control status assignment prior to plaintiff's arrival at Granville C.I.; when plaintiff arrived at Granville C.I., he was housed on his then-current HCON control status; "NCDPS policies and procedures were followed regarding review of his control status and promotion"; "[i]t is not improper for an offender to remain in their same cell after promotion to control status RHCP"; "once an offender promotes to control status Modified Housing, they are traditionally transferred from Granville C.I. to another facility"; "staff at Granville C.I. are not able to transfer an offender until . . . instructed to do so by the Population Management office in Raleigh"; "[t]he speed and timing of transfers depend entirely on available bed space at an appropriate facility"; and plaintiff was transferred "to another

12

facility, where he could be housed commensurate with his then-current Control Status, as quickly as possible." Defs.' App., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶¶8–15.

Faulcon declares, *inter alia*: Faulcon has "no personal control over [plaintiff's] custody level or control status"; such "decisions are made by Division of Adult Correction Staff members located in Raleigh, NC"; Faulcon's review found his "custody level and control status were correctly annotated in the NCDPS system"; when plaintiff "became eligible for transfer . . . he was 'backlogged' for transfer" meaning he was "put into the queue to transfer out of Granville C.I. when space became available at an appropriate facility"; "[o]ffenders cannot be transferred out of one facility to another facility when spaces are not available"; in this timeframe, "transfers between facilities were limited to avoid the spread of COVID-19"; plaintiff "was unpleased that he could not immediately be transferred from Granville C.I. to another facility"; although he remained at Granville C.I., his privileges were determined by his classification, not the facility; plaintiff's "privileges were reinstated, per policy, as soon as he became available to receive them"; during this timeframe, plaintiff's "privilege status changed numerous times as he was continually getting into trouble within NCDPS facilities"; and inmates' "privilege status changes every time they are involved in a disciplinary incident." Defs.' App., Ex. 5, Faulcon Decl. [D.E. 78-15] at ¶¶4–16.

As noted above, the complaint is not verified, cf. Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021), and, aside from one declaration regarding mental health issues, see Pl.'s Ex. E, [D.E. 11] at 6, plaintiff also has not offered other affidavits, declarations, or other competent summary judgment evidence in opposition to defendants' motion for summary judgment despite receiving adequate notice pursuant to Roseboro and having an opportunity to do so, see Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021).

13

The record supports the above declarations and belies plaintiff's claims that, during the timeframe at issue, he remained infraction free but did not receive "merit time" or "gain time."[9] See Defs.' App., Ex. 1B, [D.E. 78-3] at 1 (plaintiff's infraction history showing an Aug. 25, 2020, infraction for setting a fire); id., Ex. 3B, [D.E. 78-13] at 1–2 (plaintiff's sentence credits/penalties record, dated Nov. 3, 2022, reflecting his receipt of gain time/merit time within the relevant timeframe); see also Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

To the extent plaintiff ascribes loss of gain time/merit time to disciplinary proceedings at Tabor C.I., he has not shown that such losses were attributable to defendants. See Defs.' App., Ex. 1D, [D.E. 78-5] at 1–6 (OPUS information as to Apr. 15, 2019, disciplinary convictions on plaintiff's charges for Mar. 12, 14, and 15, 2019, false allegations on staff at Tabor C.I.).

After considering the record evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of demonstrating the absence of a genuine issue of material fact as to plaintiff's surviving Fourteenth Amendment due process claim, Celotex, 477 U.S. at 325, whereas plaintiff merely rests upon the allegations in his complaint, cf. Anderson, 477 U.S. at 248–49, and fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis

---

[9] Although, as plaintiff notes, Cooper's response to plaintiff's request for admission acknowledged plaintiff "was not eligible for sentence credits (gain time/good time) during his prolonged solitary incarceration at [Granville C.I.], see [D.E. 85] at 12, Cooper also denied that plaintiff "would have been eligible if he was placed in the correct housing assignment that corresponded with his housing status during September 2019 through October 2020," see id. at 13.

14

and quotation omitted). Accordingly, defendants are entitled to summary judgment on this claim. Anderson, 477 U.S. at 249.

The court now turns to the First Amendment retaliation claim. See Compl. [D.E. 4] at 7 (alleging he was held in "solitary" for months "for retaliation of saying I was gone [sic] file a lawsuit"). Plaintiff states both that he was not transferred due to his threats to file a lawsuit and he was suddenly transferred after filing this suit. See Pl.'s Stmt. Mat. Facts [D.E. 82] at ¶¶8, 10.

As to retaliation claims, generally, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right," and must allege specific facts supporting the claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimension. Adams, 40 F.3d at 74–75.

To succeed on his First Amendment retaliation claim, plaintiff must show that: 1) he engaged in protected First Amendment activity; 2) defendants took action that adversely affected that protected activity; and 3) a causal relationship exists between the protected activity and defendants' conduct. See Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) ("Martin I"), cert. denied, 138 S. Ct. 738 (2018); Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537 (4th Cir. 2017) (citation omitted), cert. denied, 138 S. Ct. 755 (2018); Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015) (requiring a "rigorous" but-for standard for the causation element).

As to the first element, inmates have a protected First Amendment right to be free from retaliation for filing a lawsuit. Booker, 855 F.3d at 544 (noting the Fourth Circuit "has long held that prison officials may not retaliate against prisoners for exercising their right to access the courts"). As to the second element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First

15

Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (citations omitted). As to the third element, courts apply the "same-decision test" in prisoner First Amendment retaliation claims. See Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) ("Martin II") (citation omitted). Under this framework, once plaintiff shows his "protected conduct was a substantial or motivating factor" for the adverse action, the burden shifts to defendants to prove a permissible basis for this action. Id. at 300.

Defendants declare, in relevant part: they were uninvolved with the decision at Tabor C.I. to place plaintiff in HCON control status; custody level or control status decisions "are made by Division of Adult Corrections staff members located in Raleigh, NC, not at the facility"; plaintiff was "in queue" for a transfer from Granville C.I. after his control status change; a backlog and COVID-19 precautions prevented plaintiff's earlier transfer; defendants never had a conversation where plaintiff informed defendants of an intent to file a lawsuit; defendants never told plaintiff that they "would make sure [plaintiff] rotted in his cell" or that defendants do what they want because plaintiff is an inmate; defendants treated plaintiff with "fairness, dignity, and respect in every interaction"; plaintiff was not held in Granville C.I.'s Controlled Housing Unit HCON because he told members of NCDPS that he intended to file a lawsuit; and plaintiff "was housed in HCON for his lengthy infraction history." See Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶¶12–15, 20, 25–26, 28, 31–32; id., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶¶9–10, 13–15 17, 19, 22–23; id., Ex. 5, Faulcon Decl. [D.E. 78-15] at ¶¶ 4–5, 7–9, 18–19, 21–23.

Paula King declares, inter alia: plaintiff's "assignments throughout his incarceration with NCDPS have followed proper review protocol and procedures"; plaintiff was assigned to HCON before his April 16, 2019, transfer to Granville C.I.; "[t]he speed and timing of transfers depend

16

entirely on available bed space at an appropriate facility"; "[d]uring this timeframe, transfers of inmates within NCDPS was greatly curtailed due to COVID-19. Inmates were transferred in pods and when beds became available as mitigation measures to prevent the spread of COVID-19 within the communal living spaces of correctional facilities"; [t]hese steps were taking to attempt to mitigate the spread of COVID-19 among the Division of Corrections in response to a declared global pandemic"; plaintiff "was 'backlogged' for transfer to another facility, meaning placed on a transfer list, when he became eligible for transfer"; plaintiff was transferred to a facility "where he could be housed commensurate with his then-current Control/custody Status, as quickly as possible." Defs.' App., Ex. 3, King Decl. [D.E. 78-11] at ¶¶8, 10, 12–16.

The record supports these declarations.[10] See id., Ex. 1B (plaintiff's infraction history); id., Ex. 2B [D.E. 78-8] (plaintiff's control-status history); id., Ex. 2C [D.E. 78-9] (plaintiff's housing assignment history); id., Ex. 2D [D.E. 78-10] (plaintiff's external movement history).

Because plaintiff's bald retaliation claims merely rest upon the allegations in his complaint, cf. Anderson, 477 U.S. at 248–49, and because his responses in opposition to defendants' motion for summary judgment are speculative and unsupported, see Bouchat, 346 F.3d at 522 (4th Cir. 2003), he fails to satisfy his initial burden to show that his "protected conduct was a substantial or motivating factor" in defendants' "decision to take adverse action" such that the court need not

---

[10] Although, as plaintiff notes, Hawkins's response to plaintiff's request for admission acknowledged that Hawkins was aware of this lawsuit as to "prolonged incarceration in solitary confinement," see [D.E. 85] at 13, this admission does not inherently contradict Hawkins's declaration that he never had a conversation where plaintiff informed Hawkins of an intent to file a lawsuit, see Defs.' App., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶16. Additionally, although plaintiff argues that "transfers never stopped" due to COVID-19, and seeks to rely upon a January 3, 2021, newspaper article in the Durham Herald Sun wherein "Watkins, the employee association director, noted that state leaders continue to transfer many inmates and staff members from prison to prison," see Pl.'s Ex. K, [D.E. 21] at 1, the article itself notes Watkins's statement that prisons "sharply limited inmate transfers in April and May. But those transfers later resumed." Id. This article also does not conflict with defendants' declarations that plaintiff was transferred as quickly as possible considering the backlog, limited available space, and COVID-19 mitigation efforts.

apply the burden-shifting framework of the "same-decision test." Cf. Martin II, 977 F.3d at 300; see Adams, 40 F.3d at 74–75; see also Maben v. Thelen, 887 F.3d 252, 264 (6th Cir. 2018) (noting "an inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory[.]" (quotation and citation omitted)), reh'g denied (Apr. 19, 2018); Taylor v. Manis, No. 7:20-CV-00121, 2021 WL 519903, at *6 (W.D. Va. Feb. 11, 2021) (finding a plaintiff's conclusory allegations of retaliation failed to "satisfy his initial burden to show that his 'protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action.'" (quoting Martin II, 977 F.3d at 300)).

Thus, because plaintiff again has failed to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587, defendants also are entitled to summary judgment on his First Amendment retaliation claim, Anderson, 477 U.S. at 249.

The court now turns to plaintiff's Eighth Amendment claim. Plaintiff alleges he discussed being a mental health level 3 inmate with Cooper and Hawkins and informed them that his mental health was worsening because of his prolonged stay at Granville C.I. despite his intervening custody classification promotion.[11] Mot. Attach. [D.E. 16-1] at 1.

Plaintiff elsewhere declares: he is "in the system of DPS as a mental health level 3 inmate"; he takes medication for mental health issues"; "officials no [sic] this for a fact it's in the system"; he has "let it be known that by [him] being in super-max isolation so long that [his] mental health

---

[11] Although plaintiff alleges Cooper and Hawkins "laughed" at him when he told them that his mental health had "gotten worser [sic]," Mot. Attach. [D.E. 16-1] at 1, as noted above, this complaint is unverified, whereas Cooper and Hawkins declare that they treated plaintiff with "fairness, dignity, and respect in every interaction" and did not "laugh at [plaintiff] when he told [them] about any medical concerns," see Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶¶28, 30; id., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶¶19, 21. Accordingly, this unsupported allegation cannot survive defendants' motion for summary judgment. See Anderson, 477 U.S. at 248–49; Bouchat, 346 F.3d at 522.

18

has gotten worser [sic]"; he is "starting to hear voices and sometimes [he] see[s] things that's not really there [sic]"; he "let [his] psychologist no [sic] as well"; he's "filed a grievance concerning [his] mental health issues and that is also in the system"; he "went to Central Prison last month for trying to commit suicide," was admitted September 2, 2020, and discharged September 9, 2020; "H-CON Super-Max staff came and got [him] again after [he] tried to commit suicide"; and he "let Captain Ms. Moore no [sic] at Central Prison that [his] status is not H-Con Super-Max status and [he] should not be going back there." See Pl.'s Ex. E, [D.E. 11] at 6.

"In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

"Deliberate indifference" to a prisoner's "serious medical needs" violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

19

A prison official, however, is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (finding defendant must have "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the defendant's] action or inaction."); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (requiring prison official knew of and disregarded an "objectively serious condition, medical need, or risk of harm"). Beyond actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241 (quotation marks and citation omitted); see Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it.").

Plaintiff's filings include contemporaneous medical notes describing mental health issues. See [D.E. 60-1] at 11–12 (Nov. 6, 2020, psychiatric progress note with Dr. Sandhu stating: he has been out of HCON since Sept. 2019, but is "now possibly facing demotion back to control housing after setting a fire on 08/2020"; "there is no apparent, current, significant risk of self-injury noted"; he "reported he tried to set fire in the room to kill himself August 2020"; subjective assessment that "he is frustrated at still being in HCON after being promoted out over a year ago," "he reports he is starting to hear whispers, seeing shadows, and specifically wants writer to record so that he can reference for his worsening condition in lockdown," "when asked about the whispers, what they say, he does not elaborate, says he hears voices and stuff, spirits," and "He says shadows are like a, glare walk off [sic]"; objective assessment of anxious mood and frustration from being in lockup, but denial of suicidal and homicidal ideation; and diagnosing "adjustment disorder with

20

mixed anxiety and depressed mood, ADHD by history, r/o unspecified trauma and stressor"); id. at 13–14 (Dec. 21, 2020, restrictive housing routine follow-up evaluation with Dr. Wilson noting: "no elevated risk factors presently noted" for self-injury; he is now "RPOP in HCON and has been quite frustrated about the fact that he should have been out of HCON 09/2019 when he first promoted to RHCP"; "with Covid restrictions in place there is very little inmate movement"; "He has not been a management problem recently. [He] did get frustrated back in August and set a fire, but has since served the disciplinary time for that and has been patiently awaiting transfer"; and no diagnostic changes).

The record also reflects, as to plaintiff's interrogatories asking what procedures are "followed after a prisoner reports to correctional staff that they are suicidal and at risk of harming themselves," Hawkins responded, "The individual is placed on SIB precautions and direct supervision is employed. Medical and clinical assessments are completed," and Cooper responded, "Once an Offender reports he has suicidal ideations this must be reported to OIC who then reports this to Mental Health staff for assessment." See [D.E. 85] at 6.

As to the interrogatory asking defendants to describe what procedures were followed when plaintiff told defendants "that his mental health was diminishing and he was suicidal," Cooper responded, "He did not report this to me," and Hawkins responded, "I don't know due to having no access to this information." Id.

As to the interrogatory asking defendants to "[d]escribe in detail all conversation [defendants had] with [plaintiff] . . . concerning his segregation or control status, gain time, mental health, and/or his desire to file a lawsuit for his prolonged solitary confinement incarceration," Cooper responded he had no such conversations, and Hawkins responded as follows:

21

In general each conversation that occurred with [plaintiff] usually began with him suggesting he was going to violate rules if he was not transferred. [Plaintiff] was always informed that requests have been made to Population Management to transfer the promoted offenders. [Plaintiff] was also informed that if he violated rules, a report would be authored and investigated.

Id. at 5.

The record also reflects, in response to plaintiff's request for admissions, Cooper admitted knowing that plaintiff was a category "mental health 3" prisoner, and Hawkins admitted that he "spoke to [plaintiff] about his diminishing mental health, including his suicide attempts and suicidal ideation, due to his prolonged stay in solitary confinement and segregation status."[12] Id. at 10. Cooper and Hawkins also admitted "that all prison personnel share responsibility for preventing serious self-injurious behavior and suicide by recognizing and immediately reporting warning signs." Id. Cooper and Hawkins, however, both denied that they "did not follow the standard operating procedure for self-injurious behavior intervention when [plaintiff] expressed to [them] that his mental health was diminishing due to prolonged solitary confinement." Id. at 11.

The court presumes, without deciding, that plaintiff's alleged health issues at Granville C.I. were "objectively sufficiently serious," Strickler, 989 F.2d at 1379, that Cooper and Hawkins knew he suffered from mental health issues, and that plaintiff spoke to Hawkins about his declining mental health, including suicide attempts and suicidal ideation, due to his prolonged stay at Granville C.I. Nevertheless, because they are not alleged to be medical providers, Cooper and Hawkins were entitled to rely upon the opinion of medical experts from whom plaintiff was

---

[12] These responses appear to conflict with the declarations of Cooper and Hawkins. See Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶¶28–30; id., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶¶19–21 (both declaring they "did not have specific knowledge of [plaintiff's] medical history during his confinement at Granville C.I." and they "never had a specific conversation with [plaintiff] regarding his medical conditions."). The court resolves this conflict in plaintiff's favor and presumes, without deciding, that Cooper was personally aware of plaintiff's status as a mental health level 3 inmate, and that Hawkins had at least one conversation with plaintiff regarding plaintiff's declining mental health, including suicide attempts and suicidal ideation, due to his prolonged stay at Granville C.I.

22

receiving treatment, and there is no showing that these experts explicitly recommended plaintiff's transfer. Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see Lewis v. Hoke Cnty., No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020) ("[P]rison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." (citation omitted)), report and recommendation adopted, No. 1:17CV987, 2022 WL 292928 (M.D.N.C. Feb. 1, 2022), aff'd, No. 22-6171, 2022 WL 1641282 (4th Cir. May 24, 2022).

To the extent defendants' purported failure to earlier transfer him contributed to his alleged declining mental health, plaintiff also has not demonstrated that this decision was "without legitimate penological objective," cf. Grayson, 195 F.3d at 695, especially where, as here, declarations in support of defendants' motion for summary judgment reflect that: defendants could not transfer plaintiff until instructed to do so by the Population Management office; this transfer was delayed due to the curtailing of transfers during the COVID-19 pandemic, a transfer backlog, and lack of bed space; and plaintiff was transferred as quickly as possible. See Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶¶20–24; id., Ex. 3, King Decl. [D.E. 78-11] at ¶¶12–16; id. Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶¶13–15; id., Ex. 5, Faulcon Decl. [D.E. 78-15] at ¶¶7–9, 11.

Plaintiff's prior declaration does not reiterate any of the specific deliberate indifference claims against Hawkins and Cooper that plaintiff alleged in his amended complaint. Compare Pl.'s Ex. E, [D.E. 11] at 6, with Mot. Attach. [D.E. 16-1] at 1. Hawkins and Cooper, by contrast, specifically declare that they "did not intentionally disregard any medical conditions during

23

[plaintiff's] confinement." Defs.' App., Ex. 2, Cooper Decl. [D.E. 78-6] at ¶29; id., Ex. 4, Hawkins Decl. [D.E. 78-14] at ¶20. Plaintiff's responses to defendants' motion for summary judgment again merely reiterate the bare assertions of deliberate indifference in his complaint, but these unsupported claims cannot survive defendants' motion for summary judgment. See Anderson, 477 U.S. at 248–49; Bouchat, 346 F.3d at 522; see also Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) ("[C]onclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." (citation omitted)).

In sum, plaintiff has shown that Hawkins and Cooper, at most, "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844. Thus, because plaintiff fails to demonstrate Hawkins and Cooper knew of and disregarded his serious medical needs, or otherwise acted with the requisite culpable state of mind, he also fails to satisfy the subjective component of a viable deliberate indifference claim. See Farmer, 511 U.S. at 837; Jackson, 775 F.3d at 178; Iko, 535 F.3d at 241; Shakka, 71 F.3d at 166; Strickler, 989 F.2d at 1379; see also Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a §1983 plaintiff to "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights," but finding that mere knowledge of such a deprivation does not suffice (internal quotation marks omitted)).

Thus, because plaintiff again has failed to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587, defendants likewise are entitled to summary judgment on his Eighth Amendment claim, Anderson, 477 U.S. at 249.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages if their "conduct does not violate clearly established statutory or constitutional rights

24

of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, defendants are entitled to qualified immunity because reasonable officials in their positions would not have recognized that their actions violated plaintiff's clearly established rights. See id. at 743; Malley v. Briggs, 475 U.S. 335, 341 (1986) ("The *Harlow* standard is specifically designed to . . . permit the resolution of many insubstantial claims on summary judgment . . . .'"); see also United States v. Sobrado, No. 1:18-CR-615-1, 2021 WL 2328143, at *3 (D.N.J. June 7, 2021) (stating, "as a result of the rapid spread of COVID-19 throughout prisons, prisoners [ ] were likely to experience prolonged lockdowns to prevent the spread of COVID-19," and recognizing that accompanying delayed transfers may result in loss of privileges and program participation).

### Conclusion:

For the reasons discussed above, the court GRANTS defendants' motion for summary judgment [D.E. 75]. The clerk shall close the case.

SO ORDERED this 12th day of May, 2023.

RICHARD E. MYERS II
Chief United States District Judge

25